**ZELMA CASON, a feme sole, v. MARJORIE KINNAN BASKIN and NORTON BASKIN, as her husband.**

20 So. (2nd) 243                                    June Term, 1944
November 24, 1944                                          En Banc
Rehearing denied January 16, 1945

*J. V. Walton* and *Kate L. Walton,* for appellant.
*Crawford & May,* for appellees.

BROWN, J.:

Plaintiff below, appellant here, Miss Zelma Cason, a resident and native of Island Grove in Alachua County, Florida, brought suit in the Circuit Court of Alachua County in February 1943, against the defendants, Mrs. Marjorie Kinnan Baskin, "sometimes known as Marjorie Kinnan Rawlings," and her husband, Norton Baskin, also residents of Alachua

County, in an action sounding in tort for damages. The husband was merely a formal party defendant, a formality later rendered unnecessary by the adoption of Chapter 21932, Laws of 1943. The declaration consisted of four counts, of which the first two were based on an alleged invasion of plaintiff's right of privacy. The trial court sustained demurrers to each of the four counts and plaintiff declining to plead further, judgment for defendant was entered and plaintiff took this appeal.

We find no error in the court's ruling on the first, third and fourth counts.

The first and the main question presented here is whether an action may be maintained in this State for an invasion of the right of privacy. This question, which has been very ably and thoroughly briefed by counsel for the respective parties, will be discussed presently.

The first count, which is quite similar to the second failed to state that the publication, which was alleged to have constituted an invasion of privacy, was made without the knowledge and consent of the plaintiff. This was an essential allegation. Appellant argues that plaintiff's lack of consent to the publication can be implied from the allegations of the count as a whole. We think not. Furthermore, such an essential allegation should not be left to implication or conjecture. It should be expressly made, and was so made in the second count, which reads as follows:

"And in a Second Count, for that whereas, plaintiff, before and at the time of the committing of the several grievances hereinafter mentioned, lived a quiet and private life, free from the prying curiosity which accompanies either fame or notoriety, withdrawn from the public gaze, free from the insatiable interest of the great mass of people in those whose conduct or behavior attracts or warrants general public notice or interest; and, whereas, plaintiff has ever shunned and avoided notoriety and publicity, has ever cherished and held as precious the privacy of her personal life and of her acts and sayings in all her social relations; and, whereas, also plaintiff has never exhibited or sought to exploit her own name or personality for money, profit or com-

mercial gain; yet, plaintiff alleges that the defendant, Marjorie Kinnan Baskin, sometimes known as Marjorie Kinnan Rawlings, well knowing the premises aforesaid but contriving and wrongfully and maliciously intending to injure and aggrieve plaintiff and to bring her into public notoriety and to destroy the comfort of her life and the peace and tranquility of her mind, and to thrust upon plaintiff, unsought, unwarranted and undesired publicity and notoriety, utterly obnoxious to plaintiff, and to annihilate and destroy the seclusion of plaintiff's private life, and to exploit plaintiff's name and personality, did, in or about the month of March, in the year 1942, and at many and divers times within two years prior to the bringing of this suit, wilfully and maliciously publish and cause and procure to be published, of and concerning the plaintiff, to the public at large in Alachua County, Florida, and throughout the State of Florida and the United States, what purports to be a biographical sketch, description and partial life history of the plaintiff, in which the name, form, words and actions of plaintiff are reproduced by graphic descriptions, colored but, withal, creating a pen portrait of plaintiff, recognizable to plaintiff, and to friends and acquaintances of plaintiff, and which clearly identifies the plaintiff in the public mind; that such use of plaintiff's name, biographical sketch, life history and description appeared in and formed a component part of a book entitled "Cross Creek," written, published and caused to be published and offered for sale to the public at large by the defendant, as and under the name of Marjorie Kinnan Rawlings; that the said book was widely sold to and read by the public in Alachua County, Florida, and throughout all Florida and the United States, and was read by plaintiff and by friends and acquaintances of plaintiff; that the sale of said book was and is to the great commercial gain and financial profit of said defendant; that in and as a component part of said book the said defendant did publish, cause and procure to be published, of and concerning the plaintiff the matter set forth in haec verba in the first count of this declaration, beginning with the twenty-second line on page three, and ending with the fifth line on page six thereof, and to which

matter plaintiff makes reference and adopts for this second count as if here set forth in full to the like tenor. All of which was unwarranted and all without the foreknowledge, consent or acquiescence of plaintiff and against plaintiff's will."

"Whereby and by means of the committting of which said grievances by the said defendant, the plaintiff was and is greatly injured in this, to-wit: that plaintiff's personality has been violated by being exposed, exhibited and sold to the public; that plaintiff's name has been cheapened and made notorious; that plaintiff has been subjected to the contempt, ridicule and inquisitive notice of the general public to the injury of her personality and to the outrage of the finer sentiments of her nature and to the humiliation of her self-respect; that plaintiff's peace of mind has been disturbed and destroyed; that plaintiff's privacy has been invaded and her right to privacy violated; that plaintiff, herself, a private person and having an individual personality, has thus been made notorious and conspicuous to the public and has been singled out for and identified to the public notice and attention, which is utterly obnoxious to plaintiff; and plaintiff has been caused and has suffered great mental pain and personal injury by reason of the aforesaid grievance to the damage of plaintiff; and plaintiff claims One Hundred Thousand Dollars ($100,000.00)."

It will have been observed that the second count adopts and makes a part thereof that portion of the first count setting forth the published matter, forming a part of the book "Cross Creek," which was contained in the first count and which, as set forth in said first count, reads as follows:

" 'For learning a new territory and people as quickly as possible, I recommend taking the census on horseback. In 1930 my friend Zelma from the village was commissioned to take the census in the back-country sections of Alachua County. Zelma is an ageless spinster resembling an angry and efficient canary. She manages her orange grove and as much of the village and county as needs management or will submit to it. I cannot decide whether she should have been a man or a mother. She combines the more violent char-

acteristics of both and those who ask for or accept her manifold ministrations think nothing of being cursed loudly at the very instant of being tenderly fed, clothed, nursed or guided through their troubles. She was the logical census taker for our district. She knew all the inhabitants, black · and white, and every road and trail leading to their houses. None of the places could be reached by a main road, and travelling by automobile would leave most of the noses uncounted. She borrowed two horses from the manager of the Maxcey packing house, and on a bright fall morning we set out together. . . . 'It's a ———— blessing for us not many Yankees have seen country like this, or they'd move in on us worse than Sherman,' Zelma said, and reined in her horse to dismount in front of the first cabin. We finished the scanty counting along Orange Lake and cut west toward the River Styx . . . We came out at last on a turpentine still and here the population was black and dense. So many little Pickaninnies ran away from the cabins as the strange horses approached, that it was a long job gathering them all in to be counted, and their fancy names and vaguely estimated ages written down on the papers. Zelma knew all the older Negroes and many of the younger ones. She joked with some and sympathized with others, recommended cures for this and that, and promised to send medicine to one, quilt scraps to another, and a pound of little conch pea seed to yet another. She chided one lean brown girl for her immense brood, fathers unknown.

" 'I know it's too many, Miss Zelma,' the girl agreed. 'I sho' got to git me a remedy.'

'By the time we had finished the Quarters, dusk was falling. Zelma knew a short cut back to the Creek. It took us by Burnt Island, and she told me fabulous tales of it in the growing darkness. There was believed to be the grandfather of all rattlesnakes living there. Only glimpses had been had of him, but several reported to have seen his shed skin, and all agreed that it was nine feet long. The 'shed' stretches, and the snake could reasonably and conceivably have been seven feet in length. There were wild boars on Burnt Island, savage, long-tusked and dangerous. The place was also a

hideout for criminals who preferred the great rattler and the wild boars to the arm of the law. I was not happy when Zelma announced profanely that high water had covered the old road she meant to take, and we were lost. . . .

"The second day we made a wider circle. We found a cabin here and a shack there, where even Zelma did not know folk were living, silent people who gave their statistics reluctantly. We rode down a piney-wood road in the later morning and as the trees broke at the edge of a clearing, we heard a piano. It was a good piano, not quite in tune, and it was being played with the touch of an artist. I thought my senses were playing tricks on me. Surely I heard only the wind in the pines.

"Zelma said, 'I forgot that woman was buried back here.'

. . . "Martha fixed lunch for Zelma and me that day. We reached her house in the afternoon and were famished. She made us biscuits and fried white bacon, and served her best preserves. She had baked sweet potatoes still hot in the wood range and when we left she gave us a paper sack of them to carry with us. Our next stop was at a small Negro cabin and we were thirsty from the salty bacon. Zelma asked for water and a small black boy handed us up cool well water in clean gourds. When he reached up to me, he spilled the cold water on my mare's flank and she bolted like a rabbit. The woods were full of gopher holes and I dared not try to rein her in too sharply, for fear she should stumble. I gave her her head and we tore away madly, and as we went, I scattered hot baked sweet potatoes all over the piney-woods. The mare and I were both trembling when she came to a voluntary stop. I was proud of myself for having stayed on, but all I had from Zelma was her special brand of profanity for having lost the sweet potatoes.

. . . "The large edible frogs of lake and marsh have been a boon to the otherwise unemployed of Creek and village.

"My profane friend Zelma, the census taker, said, 'The b - - - - s killed the egrets for their plumage until the egrets gave out. They killed alligators for their hides until the alligators gave out. If the frogs ever give out, the sons of b - - - - s will starve to death.' . . . 'Well,' Zelma said, 'a Mediterranean fruit fly'd be a fool to lay an egg tonight'."

It might be observed at this point that, while it is alleged that the quoted portions of defendant's book, "while colored withal," created "a pen portrait of plaintiff, recognizable to plaintiff, and to friends and acquaintances of plaintiff," and that it was read by them, the fact remains that the defendant's quoted portrayal of plaintiff in her book nowhere mentions plaintiff's surname, nor the name of "the village" where she lived, and it may well be implied from these allegations that the general public, or that considerable portion of it which read this allegedly widely read book, were not informed, until plaintiff brought this suit, that the "Zelma" portrayed in the book was in fact this plaintiff—Zelma Cason of the village of Island Grove in Alachua County, Florida. By bringing this unusual type of action against a well known author, which of course, she had a perfect right to do, plaintiff thereby positively identified herself as the "Zelma" referred to in this widely circulated book and added greatly to the publicity which she alleges was so distasteful to her.

It may well have been that the admittedly famous author of "Cross Creek" did not anticipate that her sensible friend would take any exception to what she wrote, or that it would wound her sensibilities. Many, if not most, people really like publicity, but to many it is extremely distasteful, disturbing and painful.

On its face, the publication objected to by appellant does not indicate that it was "maliciously" published. However, malice is not required to be shown in cases based on an alleged invasion of the right of privacy.

The author speaks of appellant as "my friend Zelma," and, in spite of attributing to her the use of her own "special brand of profanity," on the whole she portrays plaintiff in a favorable light and evinces a real admiration for her. The quotations from the defendant's book, which appellant complains of, are on the whole complimentary and tend to create the impression that the author's friend Zelma was one who was worthy of her friendship—a fine, strong, rugged character,—a highly intelligent, and efficient person, with a kind and sympathetic heart, and a keen sense of humor.

It is true, the author states that her friend Zelma had one characteristic, which a large proportion of the people in this section of the country consider a very serious fault, especially in a woman, and yet which a good many others think a justifiable form of condemnation or reproof, according to the particular circumstances,—that is, the use of "profanity." But the one sample which the author gives of her friend's "particular brand of profanity," is really not profanity within the legal meaning of that word, even though the blank spaces in the quoted words be given the meaning which appellant contends they were intended to signify. This Court has never defined the legal meaning of the word "profanity," so far as this writer has been able to discover, but a number of other courts of last resort have done so, and practically all of them, following pretty closely the dictionary meaning, define it as the use of words importing "an imprecation of Divine vengeance," of "implying Divine condemnation," or words denoting "irreverence of God and holy things,"—blasphemous. These decisions doubtless hark back to the third Commandment of the decalogue: "Thou shalt not take the name of the Lord thy God in vain."

But the word "curse" or "cursed" has a wider meaning, and may, according to the dictionary, connote anything from a mere execration to real downright profanity, "cussing" as we frequently call it in this section. The word "cursed" must therefore be construed in the light of its context. Here the context as alleged in the declaration is: "I cannot decide whether she should have been a man or a mother. She combines the more violent characteristics of both and those who ask for or accept her manifold ministrations think nothing of being cursed loudly at the very instant of being tenderly fed, clothed, nursed or guided through their troubles." So, if many people whom the plaintiff so kindly helped thought nothing of being "loudly cursed" by her at the time, it must not have been a very objectionable form of cursing. "Kind hearts are more than coronets," and the world would be better off if we had more Zelmas of the type so graphically pictured in "Cross Creek." Most of us have known people who hide the benevolent motive which prompts their good

deeds by a brusqueness of manner bordering on harshness. And there are even more who do not want their acts of charity publicized. Plaintiff's allegations, above quoted, in effect say that she belongs to the latter class.

Our conclusion is that, in spite of the fact that the publication complained of, considered as a whole, portrays the plaintiff as a fine and attractive personality, it is nevertheless a rather vivid and intimate character sketch, and the allegations of count two taken as a whole if proven to be true would make out a prima facie case of an invasion of the right of privacy such as would authorize the recovery of at least nominal damages, unless this case falls within one of the recognized exceptions to or limitations upon that right, both of which questions we shall presently discuss.

Back in the year 1890 Samuel D. Warren and Louis D. Brandeis, later Mr. Justice Brandeis, wrote a very strong and convincing article for the Harvard Law Review, entitled "The Right of Privacy." In this article they give Judge Cooley credit for having coined the phrase, "the right to be let alone." Cooley on Torts, 2nd Ed., page 29. This article which was published in 4th Harvard Law Review, 193, begins as follows:

"That the individual shall have full protection in person and in property is a principle as old as the common law; but it has been found necessary from time to time to define anew the exact nature and extent of such protection. Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society. Thus, in very early times, the law gave a remedy only for physical interference with life and property, for trespasses *vi et armis*. Then the 'right to life' served only to protect the subject from battery in its various forms; liberty meant freedom from actual restraint; and the right to property secured to the individual his lands and his cattle. Later, there came a recognition of man's spiritual nature, of his feelings and his intellect. Gradually the scope of these legal rights broadened. Gradually the scope of these legal rights broadened; and now the right to life has come to mean the right to enjoy life,—the right

to be left alone; the right to liberty secures the exercise of extensive civil privileges; and term 'property' has grown to comprise every form of possession—the intangible, as well as tangible.

'Thus, with the recognition of the legal value of sensations, the protection against actual bodily injury was extended to prohibit mere attempts to do such injury; that is, the putting another in fear of such injury. From the action of battery grew that of assault. Much later there came a qualified protection of the individual against offensive noises and odors, against dust and smoke and excessive vibration. The law of nuisance was developed. So regard for human emotions soon extended the scope of personal immunity beyond the body of the individual. His reputation, the standing among his fellow-men, was considered, and the law of slander and libel arose. Man's family relations became a part of the legal conception of his life, and the alienation of a wife's affections was held remediable. . . . Similar to the expansion of the right to life was the growth of the legal conception of property. From corporeal property arose the incorporeal rights issuing out of it; and then there opened the wide realm of intangible property, in the products and processes of the mind, as works of literature and art, goodwill, trade secrets, and trademarks.

"This development of the law was inevitable. The intense intellectual and emotional life, and the heightening of sensations which came with the advance of civilization, made it clear to men that only a part of the pain, pleasure, and profit of life lay in physical things. Thoughts, emotions and sensations demanded legal recognition, and the beautiful capacity for growth which characterizes the common law enabled the judges to afford the requisite protection, without the interposition of the Legislature."

They go on to argue that the intensity and complexity of life, attendant upon advancing civilization have rendered necessary some retirement from the world, and that man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have be-

come more essential to the individual. They also state that the common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others, citing an old English case. This article analyzes a number of old English cases in which relief was granted upon other grounds, such as the right of property, or breach of contract, or breach of trust or confidence, etc., but in which cases they contended that the real right which was protected was the right of privacy, which right they contend includes the right to "an inviolate personality." At common law it was well settled at an early date that while the recipient of private letters might be the owner of the paper on which they were written, the writer of such letters retains a property right in the contents thereof, and the recipient could not publish such letters without the writer's consent.

In one of the cases cited in this article, in which the remedy was grounded upon a right of property, one of the judges, Lord Cottenham, declared that: "Privacy is the right invaded." This was the case of Prince Albert v. Strange (1848) 64 Eng. Reprint, 293; affirmed in 1849, 41 Eng. Reprint, 1171. In that case the English judge instructed the jury that the unauthorized publication of etchings made by the Queen and Prince Consort for their own private amusement amounted to an invasion of their privacy, but the Court saw fit to base its decision upon the nominal right of property.

Thus Messrs. Warren and Brandeis endeavored to demonstrate, and quite successfully, that the right of privacy was inherent in the common law and had been protected, as shown by a number of English cases, under the guise of property rights, etc., and that the time had come for a recognition of this right of privacy as an independent right of the individual. Eldridge in his very interesting and recent book on "Modern Tort Problems," at page 77, says that Warren and Brandeis defined the right of privacy in substance, to be "the right to be left alone, the right to live in a community without being held up to the public gaze if you don't want to be held up to the public gaze."

. See also 41 Am. Jur. page 925, and Prosser on Torts, 1941 Ed. 1050, where the right of privacy is very well defined.

The American Law Institute in its Restatement of the Law of Torts, Section 867, defines this right as follows:

"Interferences with privacy: A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other."

See also an article by Professor Roscoe Pound, "Interests of Personality," 28 Harvard Law Review, 343, 363. While this distinguished law writer recognizes the right of privacy, he adds this cautionary word:

"But, as the injury is mental and subjective, the difficulties already considered must, at least confine legal securing of the interest to ordinary sensibilities. Here, as in many other cases, in a weighing of interests the over-sensitive must give way. For over and above the difficulties in mode of proof and in applying legal redress, social interests in free speech and dissemination of news have also to be considered."

On of the most interesting law review articles on this subject is one written by Louis Nizer, a member of the New York Bar, and the author of several books and legal articles. This article appears in Vol. 39, Mich. Law Review, 526. Also the following articles, among others, on this subject have been read by this writer with much interest: George Ragland, Jr., in 17 Ky. Law Journal, 85; Wilbur Larramore, in Columbia Law Rev. vol. 12, 693; Roy Moreland in 19 Ky. Law Journal, page 99, followed immediately by an article per contra by Rufus Lisle; Leon Green, 27 Ill. Law Review, 237. There is a very complete and valuable annotation of the cases on this subject in 138 A.L.R., pages 22 to 110.

At page 25 of this annotation the author says:

"The following is offered, by the present writer, as a fairly comprehensive definition of what constitutes an actionable invasion of the right of privacy:—The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental

suffering, shame, or humiliation to a person of ordinary sensibilities."

In a majority of the states the existence of the right of privacy has not been passed upon by the courts.

In 41 Am. Jur. 926, it is said:

"The courts of ten American jurisdictions have definitely adopted the view that there is a legally enforceable right of privacy, three others seem to be aligned in favor of this doctrine, and it has been favorably referred to by still another court. The right is affirmed by statutes in two states. Other courts have adverted to the right of privacy, but based their decisions upon other grounds."

For more detailed information as to the position taken by our American courts of last resort, see 138 A.L.R., 25-42. It appears from such annotation that a substantial preponderance of the courts of last resort in this country which have considered the question have recognized and given effect to this right.

The first of such courts to consider the question was the Court of Appeals of the State of New York. After the right of privacy had been recognized in several cases in the lower courts in New York, including the Appellate Division of that State's Supreme Court, the New York Court of Appeals, in the case of Roberson v. Rochester Folding Box Co., 171 N.W. 538, 64 N.E. 442, 59 L.R.A. 478, denied the existence of the right of privacy and reversed the appellate division. In that case injunction was sought to restrain the unauthorized distribution of a photograph of an attractive young lady as part of an advertisement of a certain brand of flour. It was alleged that the likeness was easily recognized, although her name was not given. Under her picture, appeared the words 'Flour of the Family." The young lady alleged that this use of her picture had caused her great mental and physical distress, necessitating the employment and attendance of a physician. It was a 4 to 3 decision. Chief Judge Parker wrote the majority opinion and a very strong minority was written by Judge Gray. This decision caused such a storm of criticism that about a year later the Legislature of the State

of New York adopted a statute prohibiting the unauthorized use of a person's name or picture for advertising or trade purposes, and providing a remedy therefor.

The above case was handed down by the New York Court of Appeals in 1902. Two years later the Supreme Court of Georgia handed down a notable decision and opinion in what is usually referred to as the Pavesich case, taking a contrary view to that expressed by the New York Court in the Roberson case. The very able opinion of the Georgia Supreme Court, which was written by Justice Andrew J. Cobb, was unanimously concurred in, and is recognized as the leading case on this subject in this country and has been followed in the vast majority of the decisions of our courts of last resort since that time. It was handed down in 1904. See 122 Ga. 190, 50 S. E. 68, 2 Ann. Cas. 561, 69 L.R.A. 101. The specific holding in that case was that the publication of a picture of the plaintiff, without his consent as a part of a newspaper advertisement, for the purpose of exploiting the Insurance Company's business, was a violation of the right of privacy of the person whose picture was thus reproduced, and entitled him to recover without proof of special damages.

Hardly less notable is the opinion of Lusk, Justice, in a recent case decided by the Oregon Supreme Court in Hinish v. Meir and Frank Company, 113 Pac. (2nd) 438, 138 Am. Law Reports 1. The reading of these two cases alone is, we think, sufficient to establish that there is a right of privacy, distinct in and of itself and not merely incidental to some other recognized right, and for breach of which an action for damages will lie.

The common law has shown an amazing vitality and capacity for growth and development. This is so largely because the great fundamental object and principle of the common law was the protection of the individual in the enjoyment of all his inherent and essential rights and to afford him a legal remedy for their invasion. In the early days the rights insisted upon by litigants were largely physical, for the protection of the individual's body from harm and his property from being taken or damaged by others. Later on this principle was applied so as to enable recovery of damages

for mental suffering occasioned by physical injuries, and this principle was later given a wider application, as shown in the article written by Warren and Brandeis, as well as in the two cases we just above cited.

Sections of our Florida Declaration of Rights is a positive guarantee, in general terms, of certain basic individual rights. It reads as follows:

"Section 1. All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety."

And the fourth Section of our Declaration of Rights reads:

"Section 4. All courts in this State shall be open so that every person for any injury done him in his lands, goods, person or reputation shall give remedy, by due course of law, and right and justice shall be administered without sale, denial or delay."

These sections follow quite closely the thought contained in that greatest of all political documents, the American Declaration of Independence, wherein it says: "We hold these truths to be self evident, that all men are created equal, that they are endowed by their Creator with certain inalienable rights, that among these are life, liberty, and the pursuit of happiness. That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

The word "person" appearing in the above quoted Section 4 of the Bill of Rights, should not be confined in its meaning to the person's physical body alone. The individual has a mind and spirit as well as a body. He has thoughts, emotions and feelings, as well as physical sensations. So, the word "person" as used in said section, must be construed to mean the whole man, his personality as well as his physical body.

The words "for any injury . . . he shall have remedy by due course of law" do not mean that strictly legislative power is delegated to the courts. The words "by due course of law" would prevent such a construction. Furthermore, such a construction would be contrary to the strong prohibitions

of Art. II of our Constitution dealing with the separation of governmental powers. But these words do assume that for every injury done to an individual "in his lands, goods, person or reputation" there is a remedy provided by law—either by the statutes or by the common law,—an assumption which is practically correct if we look deep enough into the fundamental principles of the great body of the common law and exercise the recognized judicial power of applying established principles of law to new conditions and new facts as they arise. The word "injury," however, does imply the doing of some act which constitutes an invasion of a *legal* right. The law cannot possibly remedy all the evils which affect mankind. But this much can be said, in construing this Section of our Bill of Rights, that for any act of another which constitutes an injurious invasion of any right of the individual which is recognized by or founded upon any applicable principle of law, statutory or common, the courts shall be open to him and "he shall have remedy by due course of law." As above intimated, the word "law" includes not only our organic statutory law but also embraces that great body of legal principles we call the common law, as construed and applied by the courts of England and America throughout the years to new factual conditions as they have arisen, and which in such practical applications to concrete cases have broadened out from precedent to precedent" to protect the essential rights of the individual. The performance by the courts of the plain duty which has always been imposed upon them, to interpret the meaning and intent of the law and to give it due and proper application to the facts of the individual cases which come before them for decision, has resulted in a great and invaluable body of judicial precedents, some times referred to as "judge-made law." Thus the courts in carrying out their strictly judicial duties have always had an important part in what might be called the law-making process. "In this way," said the late Justice HOLMES, "the law is gradually enriching itself from daily life, as it should." He gives an illustration of this at page 121 of his book "The Common Law." It was also his view, as expressed in that book, that the courts should not hesitate to overrule judicial

precedents "when they have become inconsistent with present conditions." So the common law has been and still is a living and growing thing. As was said by Mr. Justice TERRELL in Quinn v. Phipps, 93 Fla. 805, 113 So. 419: "It is a doctrine of reason applied to experience;" its "vital pulsating principles were passed on to the English colonies of this country, where they have, by reason and interpretation, attained their complete logical development. We are therefore more essentially a common law country than England herself." The English colonies enjoyed their rights under the English common law for many years, and it was the denial and invasion of many of those rights under the reign of George III which was one of the chief causes of the American Revolution.

But the right of privacy has its limitations. Society also has its rights. The right of the general public to the dissemination of news and information must be protected and conserved. Freedom of speech and the press must be protected. Section 13 of our Declaration of Rights reads in part as follows:

"Every person may freely speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press."

The authorities we have quoted in support of the right of privacy recognize certain limitations upon that right. In 41 Am. Jur. 934, it is said:

"The right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man. The protection afforded by the law to this right must be restricted to "ordinary sensibilities,' and cannot extend to supersensitive or agoraphobia. In order to constitute an invasion of the right of privacy, an act must be of such a nature as a reasonable man can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligence, situated in like circumstances as the complainant; and this question is to some extent one of law."

And again, on page 935 of the same volume, (41 Am. Jur.) the following appears:

"The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest. At some point the public interest in obtaining information becomes dominant over the individual's desire for privacy. It has been said that the truth may be spoken, written, or printed about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest. However, the phrase 'public or general interest,' in this connection does not mean mere curiosity."

Various cases are cited in support of the text above quoted. And again, on pages 937-938 of the same volume, it is said:

"One of the primary limitations upon the right of privacy is that this right does not prohibit the publication of matters of general or public interest, or the use of the name or picture of a person in connection with the publication of legitimate news. A person who, by his accomplishments, fame, or mode of life, or by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs and his character, may be said to have become a public personage, and he thereby relinquishes at least a part of his right of privacy."

It is conceded by all the authorities, including Messrs. Warren and Brandeis, that mere spoken words cannot afford a basis for an action based on an invasion of the right of privacy.

In the cited article by Messrs. Warren and Brandeis, it is said:

"In general, then, the matters of which the publication should be repressed may be described as those which concern the private life, habits, acts and relations of an individual, and have no legitimate connection with his fitness for a public office which he seeks or for which he is suggested, or for any public or quasi public position which he seeks or for which he is suggested, and have no legitimate relation to or bearing upon any act done by him in a public or quasi public capacity. The foregoing is not designed as a wholly accurate

or exhaustive definition, since that which must ultimately in a vast number of cases become a question of individual judgment and opinion is incapable of such definition; but it is an attempt to indicate broadly the class of matters referred to. Some things all men alike are entitled to keep from popular curiosity, whether in public life or not, while others are only private because the persons concerned have not assumed a position which makes their doings legitimate matters of public investigation."

"The right to privacy does not prohibit the communication of any matter, though in its nature private, when the publication is made under circumstances which would render it a privileged communication according to the law of slander and libel."

Neither the truth of the published matter, nor the entire absence of any malice or wrongful motive on the part of the writer or publisher, constitute any defense to such an action; nor does the plaintiff have to allege or prove any special or pecuniary damages.

In the annotation in 138 A.L.R. 22, practically all the cases decided up to two years ago are reviewed. On pages 47-50 cases are cited dealing with matters of general or public interest, but on pages 82-89, the annotator reviews two cases involving works of fiction, others involving biographical works, and a few cases involving radio broadcasts, motion pictures and newsreels. Most of these cases were brought under the narrow New York statute, and are of little value to us here. The two first cases reviewed are the Damron case and the Swacker case. Wade Damron sued the publisher, the author of "Showboat" and the bookseller, in three separate actions under the New York statute, because his name was merely mentioned once by the author, Edna Ferber, in a scene laid in Catlittsburg, Ky. The court held that this did not show the use of his name for purposes of trade, and that the statute was not intended to interfere with the publication of books within proper limits, nor to outlaw the "use of local color." See 231 N.Y.S. 444. The Swacker case went off on failure to show that the "Swacker" depicted in the book was intended to refer to plaintiff, whose name was Frank M.

Swacker, and who was an entirely different type of character. The court observed that; "The statute was enacted to protect the privacy of persons, not to redress imagined wrongs or to subject authors and publishers to hazards against which it is well nigh impossible to guard." See 227 N.Y.S., 296. The cases involving biographical works seem to have been decided against the aggrieved persons on the ground that the statute applied to the use of names or pictures for purpose of trade or advertising, "not to the dissemination of information."

The motion picture cases reviewed mostly come from other states. The one most frequently cited is that of Melvin v. Reid, 112 Cal. App. 285, 297 Pac. 91. In that case, the plaintiff had a very strong case and was properly permitted to recover. Plaintiff was a woman who in her early days had lived a life of shame, had been tried for murder and acquitted, but who had been entirely rehabilitated, had married, lived a virtuous and exemplary life for some years and had achieved a place in respectable society. A moving picture was produced and put on the screen which was based on the true story of her past life, using her true maiden name. She brought suit against the producer and recovered damages. It was shown that when her friends learned the unsavory details of plaintiff's past life, from this picture, they abandoned her; all of which brought on grievous mental and physical suffering. The California Court, being hesitant to recognize the right of privacy, based its decision in plaintiff's favor upon a provision of that State's constitution guaranteeing the right of "procuring and obtaining safety and happiness."

The Sidis case, which was brought under the New York statute, and which is reported in 113 Fed. 2nd 806, and 113 A.L.R. 15, it was said:

"We express no comment on whether or not the news worthiness of the matter printed will always constitute a complete defense. Revelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's motions of decency. But when focused upon public characters truthful comments upon dress, speech,

habits, and the ordinary aspects of personality will usually not transgress this line. Regrettably or not, the misfortunes and frailities of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day."

The following extracts from Nizer's Article in 39 Michigan Law Review, 540-543, are of interest here:

"The determination of what is or is not a subject of public concern frequently requires a delicate appreciation of intangible psychological factors. The criterion is not, as the earliest cases intimated, the prominence or distinction of the person whose name or photograph is used; the differentiation between 'public' and 'private' characters which was advanced during the formative stages of the privacy doctrine has not been accepted. The courts have recognized that public curiosity is a mysterious thing and frequently concentrates most heavily on those least deserving of attention." . . .

"American newspapers customarily publish a wide variety of material which, strictly speaking, is neither news nor fiction. Such articles include travel stories and descriptions of distant places, tales of historic personages and events, the retelling of past news stories and surveys of social conditions. Although these stories do not necessarily chronicle events of very recent occurrence, they are based on fact and are semi-educational in character. In general, the courts have been quite liberal in interpreting almost any article which appears in a newspaper as 'news,' irrespective of whether it is printed in the news columns, feature pages or magazine section, on the ground that the individual's right of privacy is outweighed by the public policy requiring the circulation of information to be unhampered."

"The same test is applied to the publication of a person's name or photograph in a magazine. If the use is in connection with a factual report of important or interesting happenings, the privacy doctrine will not be invoked. If, however, the informational factor is secondary, relief may be granted.

'Books, although less timely than newspapers or magazines, frequently contain material of such immediate public concern that the right of privacy is inapplicable. However, the unauthorized use of one's name in a book of fiction may be actionable."

While the question presented is not free from difficulty, our view, as stated earlier in this opinion, is that the second count makes out a prima facie case of violation of the right of privacy. When the case is returned to the trial court, the appellee will of course have the oportunity to file such plea or pleas thereto as she may be advised.

On the record as it stands, it would be inappropriate for the court to now adjudicate the question as to whether the book "Cross Creek," including that portion of it quoted in plaintiff's declaration, is one dealing with matters "of general or public interest." That is a question which is not squarely presented by this record. It is defensive matter, unless it so clearly appears from the plaintiff's declaration as to show that plaintiff has no cause of action, in which case it could be reached by demurrer. And when pleaded as a defense, it frequently presents a mixed question of law and fact, as shown by the authorities. It is true, the first count of the declaration alleges plaintiff's conception of the nature and character of defendant's book, but we have held that the trial court was, for another reason, free from error in striking down the first count. Nor is the question presented here by demurrer, and it is very doubtful if it could have been so presented. Indeed, there is nothing in this record to show that the trial court ever considered or ruled upon this question.

We have held that the trial court was without error in sustaining the demurrer to the third count, which charged that certain portions of the matter quoted from defendant's book constituted libel. That count was bad under the rules laid down in Layne v. Tribune Co., 108 Fla. 177, 146 So. 234.

The demurrer to the fourth count was also properly sustained by the trial court. That count in effect claimed that the plaintiff was entitled to share in the profits received by the defendant for the publication and sale of her book to the

extent of one hundred thousand dollars. More specifically this count alleged that the defendant had wilfully and maliciously published and offered for sale to the public the book "Cross Creek" in which the name and personality of plaintiff were depicted and certain purported sayings of plaintiff and fragments of her life history were set forth, all without plaintiff's knowledge or acquiescence, and that many copies of the book were purchased and paid for by persons of Alachua County and throughout the United States and that thereby the defendant had received great financial profit, and had thus become unjustly enriched at the expense of and to the damage of plaintiff, to the extent of one hundred thousand dollars. One of the grounds of the demurrer to this count was that it did not allege that the life history of plaintiff was of such nature as to be of value in effecting sales of the book. Another ground was that the publication of a book containing a biographical sketch of a person does not legally entitle such person to share whatever profit is realized from the sale of such book. No authority is cited to show that the trial court committed any error in sustaining the demurrers to this fourth count and we know of none. In our opinion this count states no cause of action. Furthermore while legally permissible perhaps, it is inconsistent for plaintiff to sue the defendant for one hundred thousand dollars damages for publishing this short biographical sketch, as constituting an invasion of her right of privacy, and in the same suit claim one hundred thousand dollars damages upon the theory that she is entitled to a share in the proceeds of the sale of the book.

In sustaining the defendant's demurrer to the first, third and fourth counts, the judgment of the court below is affirmed, but insofar as the judgment of the court below sustained defendant's demurrer to plaintiff's second count, the court below was in error and the judgment appealed from is reversed and the cause remanded for the entry of a proper ruling and judgment on the demurrer, and for such further proceedings as may become appropriate and necessary, not inconsistent with the foregoing rulings of this Court.

Reversed and remanded.

CHAPMAN, THOMAS, ADAMS and SEBRING, JJ., concur.

BUFORD, C. J., and TERRELL, JJ., dissent.

BUFORD, C. J., dissenting:

As I construe the allegations of the declaration they show that the writing and publication complained of did not invade the privacy of the plaintiff or refer to her private life but attempted to portray her actions and conduct while performing the functions of a public servant in the office of census enumerator.

Therefore (absent malice, which is not shown here) the writing and publication was not actionable and judgment on demurrer sustained should be affirmed.

TERRELL, J., concurs.