575 So.2d 280 (1991)
Robert ARMSTRONG, et al., Appellants,
v.
H & C COMMUNICATIONS, Inc., D/B/a Channel 2, Appellee.
No. 90-381.
District Court of Appeal of Florida, Fifth District.
February 21, 1991.
Keith R. Mitnik of Robertson, Williams, Mitnik & McDonald, P.A., Orlando, for appellants.
H. Scott Bates of Mateer, Harbert & Bates, P.A., Orlando, for appellee.
COBB, Judge.
This appeal concerns the trial court's determination to dismiss with prejudice the plaintiffs' first amended complaint which claimed invasion of privacy and outrage by the defendant below, Channel 2. It is axiomatic, of course, that the trial court is required to accept as true all well pled allegations in a complaint. Von Engineering Co. v. R.W. Roberts Const. Co., Inc., 457 So.2d 1080 (Fla. 5th DCA 1984). Those factual allegations in the instant case are:
The six year old child of Robert and Donna Armstrong, Regina Mae Armstrong, was abducted from Orlando, Florida in June, 1985. She was wearing a sun dress at the time. In September, 1987, a construction worker in nearby Oviedo, Florida discovered a sun dress meeting the description and a child's skull. The Oviedo Police *281 Department took possession of the sun dress and the skull, but failed to make the connection with Regina Mae until July, 1988, some ten months later, at which time the Orlando Police and the Armstrongs were notified. It was determined that the remains were those of Regina Mae.
On August 2, 1988, a memorial service was held for Regina Mae. On that same day, a reporter from Channel 2, Michelle Meredith, went to the Oviedo Police Department and asked the police chief to allow her to see Regina Mae's skull. He complied by lifting the skull from a box and displaying it to Meredith, who then asked to videotape it. She staged this by having the police chief replace the skull and again remove it from the box for the camera, and had the skull tilted for a close-up. Upon obtaining the videotape of the skull, Meredith called the Channel 2 studio and informed the 6:00 p.m. news producer, one Carolyn Reitz, that she had obtained videotape of the skull. Reitz expressed her aversion to broadcasting such a videotape, but agreed to allow Meredith to present the matter to the news director, one Steve Ramsey.
A meeting was held that afternoon at which time Reitz adamantly argued that broadcast of the skull would be offensive to the public and the Armstrong family, and would cause resentment and outrage. Anchor person Steve Rondinaro agreed with Reitz. Ramsey overruled the dissenters, stating "Fuck it! We are going to run it." At this time, no one at the station had seen the film, which was still in the field with reporter Meredith. No one bothered to review or edit the film once it arrived at the station and the editors and journalists there saw it for the first time as it was broadcast live throughout Central Florida on the 6:00 p.m. news. No one at the station made any effort to contact the Armstrongs and warn them of the broadcast, although it is now admitted by the personnel of Channel 2 that such a call should have been made. The editors of Channel 2 also admit that the close-up of the skull was not newsworthy, was wrongfully aired, would not have been aired if properly reviewed before the broadcast, and was likely to cause resentment and outrage with members of the community and the Armstrongs. The staff of Channel 2, watching the broadcast, was dismayed and resentful. Ramsey then announced he had made a mistake by insisting on the broadcast, and said it would not recur. Another anchor person then called the Armstrong family to apologize for the broadcast.
The close-up of the skull was intentionally included to create sensationalism for the report. The close-up was gruesome and macabre, and was broadcast to thousands of viewers, including the Armstrongs. The broadcast opened with an emotional story on the memorial services with the photographs of Regina Mae and film footage of the family. Immediately following was a close-up of animal remains, originally thought to have been those of Regina Mae. Then, the cameraman cut directly to the Oviedo Police Chief removing her skull from the box, zoomed in for a frontal close-up of the tilted skull facing directly at the camera, and the audio identified the skull as that of Regina Mae Armstrong.
At the time of the broadcast, it was being watched by the unsuspecting Armstrong family. The emotional impact was devastating. Regina Mae's 12 year old sister, Christina, fled from the room screaming "that cannot be my sister." Many members of the public, including journalists and experienced police officials, have expressed outrage at the broadcast of the skull. It is alleged that Channel 2 knew or should have known that the Armstrong family members did not wish to view the skull or have it placed on display.
The independent tort of outrage has been recognized in Florida. See Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950). In Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985), the Florida Supreme Court adopted the definition found in section 46 of the Restatement (Second) of Torts (1965):
(d) Extreme and Outrageous Conduct.

... . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he *282 has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
We have no difficulty in concluding that reasonable persons in the community could find that the alleged conduct of Channel 2 was outrageous in character and exceeded the bounds of decency so as to be intolerable in a civilized community. An average member of the community might well exclaim, "Outrageous!" Cf. Kirker v. Orange County, 519 So.2d 682 (Fla. 5th DCA 1988). Indeed, if the facts as alleged herein do not constitute the tort of outrage, then there is no such tort.
The asserted claim based on invasion of privacy is more troublesome. Even though the alleged facts constitute the tort of outrage, those facts do not necessarily constitute an invasion of privacy, a tort originally recognized in Florida in Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944).
Therein, the Florida Supreme Court upheld an action for invasion of privacy asserted by one Zelma Cason, who was colorfully described in, and projected from obscurity into prominence by, the book entitled "Cross Creek" written by the defendant, Marjorie Kinnon Rawlings (Baskin). Cason claimed that her new found notoriety, imposed against her will, had disturbed and humiliated her. The Court held that the "right of privacy," in substance, is the right to be let alone, the right to live in a community without being held up to the public gaze against one's will, and damages will lie for breach of that right. It was further held that malice need not be shown by the plaintiff, and that neither truth nor the absence of malice or wrongful motive on the part of the defendant constituted any defense.
After the 1944 Cason opinion reinstating the plaintiff's privacy claim, which had been dismissed at a preliminary stage by the trial court, the case was remanded and went to trial before a jury in Alachua County, Florida. The defendant prevailed, and the case was again appealed to the Florida Supreme Court. This time, in Cason v. Baskin, 159 Fla. 31, 30 So.2d 635 (Fla. 1947), the court reversed the defense judgment on the basis that the trial court erroneously had allowed the defense to focus on the prominence and literary abilities of Rawlings rather than on the true issue: Was there a general and legitimate public interest in Cason? The Court concluded that this was prejudicial to a fair trial and tended to confuse the jury.
The court also found, however, that Cason had failed to prove any malice or any actual damages  no mental anguish, no loss of friends or respect in the community, no injury to character or reputation. Therefore, the court held that, while Cason had suffered a wrongful invasion of her right of privacy, she was not entitled to actual or punitive damages, only nominal damages and costs.
Unlike the Cason scenario, the public interest in the Armstrong family cannot be said to have been generated by Channel 2. The Armstrongs were thrust into the public limelight by the tragic abduction and murder of Regina Mae, and there was a legitimate general or public interest in the Central Florida area in the events related to this crime. Regina's death, the discovery of her remains, and the police investigation of the case were facts known to the public prior to the disputed broadcast by Channel 2. The fact that the Oviedo police were in possession of the skull was not protected from public disclosure by any privacy rights of the Armstrongs. The factual disclosure by Channel 2 does not fit into any of the four general categories comprising the tort of invasion of privacy as recognized by Prosser in his Law of Torts, p. 804-14 (4th ed. 1971):

*283 (1) Intrusion, i.e., invading plaintiffs' physical solitude, or seclusion; (2) Public Disclosure of Private Facts; (3) False Light in the Public Eye, i.e., a privacy theory analogous to the law of defamation; and (4) Appropriation, i.e., commercial exploitation of the property value of one's name.[1]
The appellants have urged several out-of-state cases as being supportive of their claim based on invasion of privacy. The most factually analogous of these is Bazemore v. Savannah Hospital, 171 Ga. 257, 155 S.E. 194 (Ga. 1930). In that case the Georgia Supreme Court upheld a complaint by the parents of a deceased child against a hospital, a photographer, and a newspaper for the unauthorized publication of a picture of their malformed child, which had been born with an external heart. It was alleged that the unauthorized taking and publication of the photograph had violated the parents' privacy rights, causing them humiliation and disgrace. As pointed out by the court in Bazemore, the suit was not based on injury to the deceased child (i.e., upon the theory of a relational right of privacy). Said the court: "The right, if it ever existed or now exists, began after the death of the child, and is a right of action on the part of plaintiffs."
We agree with the appellants that the issue herein posed in regard to the privacy claim is not concerned with the relational right to privacy, a theory successfully argued below by Channel 2 and again contended on appeal. But even if we agree with the conclusion of the Georgia Supreme Court in Bazemore, the facts of that case are distinguishable from those alleged in the Armstrong complaint in a significant respect. The birth of a malformed child to the Bazemores (which was considered humiliating in 1930) was a matter of private, not public, concern. On the other hand, the discovery of the remains of Regina Mae Armstrong, and their possession by the police, were legitimate matters of public interest. Bazemore, therefore, does not support the privacy claims of the Armstrongs in the instant case.
Accordingly, we reverse the trial court's dismissal of the Armstrongs' action based on the tort of outrage in Count II of their first amended complaint, and affirm the dismissal of their action based on the tort of invasion of privacy in Count I.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
GOSHORN, J., concurs.
W. SHARP, J., concurs in part and dissents in part with opinion.
W. SHARP, Judge, concurs in part and dissents in part.
I concur with the majority opinion that the tort of intentional infliction of severe emotional distress[1] was sufficiently pled in the Armstrongs' amended complaint to withstand Channel 2's motion to dismiss for failure to state a cause of action. However, I would also reverse the dismissal of count I, invasion of privacy, although in this case the two counts may prove to be identical and require an election by the Armstrongs at a subsequent point, as to which tort to pursue.[2]
The invasion of privacy tort is a much older common law creation than the tort of "outrage" now encompassed in section 46, Restatement of Torts, and its recognition and adoption by the Florida Supreme Court in Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985). A tort arising out of the invasion of a person's right of privacy was first posited to exist in the common law by Warren and Brandeis' famed article in the Harvard Law Review published in 1890.[3] It has since been compartmentalized and rigidly formulated by *284 section 652 of the Restatement (Second) of Torts (1977) and at least one of its categories (the first subsection) was recognized and adopted by the Florida Supreme Court in Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1945). But a case may, based on its peculiar turn of fate and fact, fit more than one ground, and involve a combination of the subsections.
In an attempt to limit the invasion of privacy tort, a majority of the courts ruled that only persons whose privacy rights are invaded have standing to bring this cause of action. But, the Restatement of Torts and other authorities do not foreclose a suit by close family members where their emotional psyches have suffered injury due to unwarranted publicity concerning a deceased relative.[4] Indeed, the long famous and often cited cases of Douglas v. Stokes, 149 Ky. 506, 149 S.W. 849 (Ky. 1912) and Bazemore v. Savannah Hospital, 171 Ga. 257, 155 S.E. 194 (Ga. 1930) were both decided on the basis of unwarranted invasion of the parent's right of privacy by publicizing pictures of the nude bodies of the plaintiffs' deceased children. As the court explained in Douglas v. Stokes:
The most tender affections of the human heart cluster about the body of one's dead child. A man may recover for any injury or indignity done the body, and it would be a reproach to the law if physical injuries might be recovered for, and not those incorporeal injuries which would cause much greater suffering and humiliation. [citations omitted]
149 S.W. at 850.
Most of the suits involving mishandling the remains of deceased persons have been brought under the banner of the newer tort (intentional infliction of emotional distress) in Florida.[5] But, I can find no Florida case on point which expressly holds that parents do not have a right of privacy action for the unwarranted and outrageous publication of pictures of their deceased child's body or body parts. Indeed, I agree with the Fourth District's opinion in Loft v. Fuller, 408 So.2d 619 (Fla. 4th DCA 1981), rev. denied, 419 So.2d 1198 (Fla. 1982), that such a cause of action may well exist.
When there are unusual circumstances, such as those that were involved in most of the cases which have recognized claims by the relatives, it may be that a defendant's conduct towards a decedent will be found to be sufficiently egregious to give rise to an independent cause of action in favor of members of decedent's immediate family.
Loft, 408 So.2d at 624.
I also note that in Fletcher v. Florida Publishing Co., 319 So.2d 100 (Fla. 1st DCA 1975), quashed, 340 So.2d 914 (Fla. 1976), cert. denied, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977), the First District allowed a tort count to stand which was based on a mother's invasion of privacy, stemming from the photographing and publication of a picture of the silhouette of her child's body marking the spot where the child died in a fire. Ultimately a summary judgment for the defendant was upheld by the Florida Supreme Court, but significantly, not on the standing ground.
Thus, I conclude that the parents and sister in this case have stated a valid cause of action for intentional infliction of emotional distress as well as invasion of their right of privacy not to have their daughter's and sister's remains lugubriously videotaped and televised. In this case, since the outrageous act complained of in both counts was the televised spectacle of Regina Mae's skull, essentially only one tort is involved and can be asserted as a basis for liability. But if there were other additional outrageous acts alleged involving Regina Mae's remains, I would have no difficulty affirming a recovery under both counts.
NOTES
[1] See Loft v. Fuller, 408 So.2d 619 (Fla. 4th DCA 1981), review denied, 419 So.2d 1198 (Fla. 1982).
[1] Restatement (Second) of Torts § 46 (1965).
[2] See Phillips v. Ostrer, 481 So.2d 1241, 1245 (Fla. 3d DCA 1985), rev. denied, 492 So.2d 1334 (Fla. 1986); Besett v. Basnett, 437 So.2d 172 (Fla. 2d DCA 1983).
[3] The Right to Privacy, 4 Harv.L.Rev. 193 (December 15, 1890).
[4] Restatement (Second) of Torts, § 6521 (1977); 1 Fla. Torts § 24.07[1] (1990).
[5] See, e.g., Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950); Smith v. Telophase National Cremation Soc., Inc., 471 So.2d 163 (Fla. 2d DCA 1985); Scheuer v. Wille, 385 So.2d 1076 (Fla. 4th DCA 1980).