**ZELMA CASON, a feme sole, v. MARJORIE KINNAN BASKIN and NORTON BASKIN, as her husband.**

30 So. (2nd) 635                                   January Term, 1947
May 23, 1947                                               En Banc
Rehearing denied June 20, 1947.

*Walton & Walton* and *Clayton & Arnow,* for appellant.
*Crawford & May,* for appellees.

CHILLINGWORTH, Associate Justice:

This is an appeal by Plaintiff from a verdict and judgment for defendants, an author and her husband.

When this case was first before this Court, Cason v. Baskin, 155 Fla. 198, 20 So. (2) 243, the Court, in a comprehensive opinion prepared by Justice BROWN, held the second count of the declaration stated a cause of action on the theory that the publication by the defendant, author, constituted an unwarranted invasion of plaintiff's right of privacy, such as would authorize the recovery of at least nominal damages. It was further held that malice was not required to be shown by plaintiff; that neither truth, nor the entire absence of malice or wrongful motive on the part of the defendant, constituted any defense; and that plaintiff, under the declaration, did not have to allege or prove any special or pecuniary damages.

Hence the law of the cause of action has been heretofore established by this Court.

After the case was remanded, the defendants filed eighteen pleas, and then four amended pleas. The Court, after various rulings, held as sufficient Pleas 1, 3, 11, 14, 16, and Amended Plea 17.

The defendants filed sixty-two interrogatories, directed to the plaintiff. The plaintiff propounded seven interrogatories to the defendants. Amendments to some interrogatories were filed. Answers to certain of the interrogatories were made by the parties. Depositions were taken. Motions were made concerning some of the depositions and were ruled upon by the Court. This warfare by pleading ceased, and the case went to trial before a jury. Some forty witnesses, mostly for the defendant, testified in person or by deposition. The trial lasted eight days.

In view of the conclusion reached in this opinion, it will only be necessary to discuss Amended Plea 17 and some of the evidence offered by the defendant, and by the plaintiff.

The Amended 17th Plea of the defendant is as follows:

"The defendant author has for most of her mature life engaged in journalistic and literary work. Since 1928 the energies and attention of the defendant author have been continuously occupied in the production of books and stories based on the section of Florida in which defendant author lives and on the lives of the people among whom she lives, which books and stories became popular and were widely read throughout the United States and in many foreign countries. Among the books which plaintiff wrote was 'The Yearling,' originally published in April, 1938, which was more popular and more widely praised than any of the defendant author's previous literary work. It was successively published in ten American editions, including an edition issued by Book of the Month Club, a widely recognized organization engaged in the selection of the best book published in America each month and its circulation among numerous members of said organization in the United States and throughout the world. 'The Yearling' was appraised by a recognized American Literary critic as 'a minor American classic, not only as an important

piece of regional literature, but as introducing one of the most appealing boy characters since 'Huckleberry Finn.' 'The Yearling' was also published in native language editions in England (2 editions), Spain, France, Finland, Norway (2 editions), Hungary, Poland, Italy, Sweden, Denmark, Germany, Greece and Holland and Japan. The defendant reasonably believed that the public would be interested in her autobiography covering the period of her life in the section of Florida about which the much greater portion of her writings have been done, and so undertook the writing of 'Cross Creek,' which was published in March, 1942, and was her first full length book published after 'The Yearling.' 'Cross Creek' was well received by the literary public and by readers of all classes in the United States and elsewhere. 'Cross Creek' was more extensively read in the United States and England than had been 'The Yearling.' The edition of 'Cross Creek' issued by said Book of the Month Club had a circulation more than three times as large as the circulation of 'The Yearling' by said organization. Both 'The Yearling' and 'Cross Creek' were published in the Armed Services Edition by the Council on Books in War Time, Inc., a non-profit organization of American publishers of general (trade) books, librarians and book-sellers for exclusive distribution to members of the American Armed Services, to supply them in small, convenient and economical form, the best books of the present and past. 'Cross Creek' had a slightly larger circulation in the Armed Services Edition than did 'The Yearling.' The comments on 'Cross Creek' and, particularly, that portion thereof relating to plaintiff quoted in said count, by literary critics and the public generally and members of the American Armed Services throughout the world has been extensive and favorable. The quoted portions of said book 'Cross Creek' of which plaintiff in said count complains was of such a nature that its inclusion in said book should not offend or injure plaintiff or any person of ordinary feelings and intelligence, situated in like circumstances as plaintiff, so written about. The defendant author did not have reason to believe and did not apprehend that the publication of the portions of her said book quoted in said count could or would

cause mental distress or injury to plaintiff. By reason whereof the defendants say that the things and people about which the defendant author wrote in said autobiography are matters of legitimate general public interest, and she was privileged to publish the matter complained of under Section 13 of the Declaration of Rights in the Constitution of the State of Florida."

This Amended 17th Plea purports to allege facts showing that the matter published in "Cross Creek" was of legitimate public and general interest, as a result of which the defendant was entitled to file a plea of privilege.

It is true that a person who, by his accomplishments, fame, or mode of living, or by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs, and his character, may be said to have become a public personage, and to that extent he thereby relinquishes at least a part of his right of privacy. Pavesich v. New England Mut. L. Ins. Co., 122 Ga. 190, 50 S. E. 68, 69, L. R.. A. 101. There may be a limited scrutiny of the "private life" of any person who has achieved, or who has thrust upon him, the status of a "public figure." Sidis v. F. R. Publishing Corp'n. (CCA 2d) 113 F. (2) 806, 138 A. L. R. 15; Certiorari denied in 311 U. S. 711, 85 L. ed. 462, 61 S. Ct. 393.

As to who may be deemed a public figure, it has been laid down that any person who engages in a pursuit or occupation which calls for the approval or patronage of the public submits his private life to examination by those to whom he addresses his call, to the extent that may be necessary to determine whether it is wise and proper to accord him the approval or patronage which he seeks. One who engages in public affairs and public life to an extent which draws the public interest upon him may be deemed to have consented to the publication of his picture. Pavesich v. New England Mut. Life Ins. Co., supra, Annotation in 138 A.L.R. 59. The right of privacy was discussed by Warren and Brandeis in 4 Harvard L. Review, pp. 193 to 220, and a text page 21d, as follows:

"The right to privacy does not prohibit any publication of matter which is of public or general interest. . . . The

design of the law must be to protect those persons with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity and to protect all persons whomsoever; their position or station, from having matters which they may properly prefer to keep private, made public against their will. It is the unwarranted invasion of individual privacy which is reprehended, and to be, so far as possible, prevented."

In analyzing this Amended Plea 17, it does not appear to meet the test set forth by the authorities. The plea seeks to justify the publication of this matter concerning the plaintiff because of the fame of the author, the widespead distribution of the book, the general acceptance of the book by many people, both in America and abroad, and because of the great literary merit and popularity of the book. The Plea does not allege that there was a legitimate general public interest in the plaintiff. The eminence of the defendant as an author and the excellence of her writings afford no basis for her privilege to destroy the right of privacy accorded by law to the plaintiff. Nor can the defendant create a public interest in an area or a community, and thereby justify the invasion of privacy of one who happens to live in that particular area or community.

We, therefore, hold that, because the Plea fails to show that there was any pre-existing legitimate general or public interest in the plaintiff, it fails to present a valid defense to the cause of action, either by way of a plea in bar or by confession and avoidance.

However, the real harm under the 17th Plea was the admission of a great mass of immaterial and prejudicial evidence. Counsel for the defendant contends that the honors which came to the defendant were demonstrative facts showing a wholesome and legitimate public interest in her, her home, and her neighbors. In carrying out this theory of defense, many witnesses were called who paid high tribute to the defendant as an author and as a successful personage. The defendant was asked, on the stand, to turn to Chapter 5 of the book and interpret it as it was written in her mind and heart. In response to such a question she gave a most

interesting story of her views, impressions and opinions. She testified that she had received thousands of letters concerning her writings and that an infinitesimal portion were unfavorable.

Many witnesses testified for the defendant. Some were asked to express their opinions as to whether or not the characterization in the book would offend the normal sensibilities of one situated as the plaintiff was situated, and whether or not they considered the portions of the book relating to the plaintiff objectionable. A noted historian testified, as a critic, as to the tremendous importance of this work of the defendant's. He said it gave the defendant more than a national reputation, and unquestionably gave her an international literary reputation as an interpreter of life. He also expressed his opinion of the reaction of the people of Florida to the production of the book, and told of an honorary degree being conferred upon the defendant. A Naval chaplain testified that the reception given "Cross Creek" by service men in the South Pacific, during World War II, was very favorable. A college professor testified he thought that "The Yearling" was a first-rate novel in every way, and stated that it had been awarded the Pulitzer prize in 1938. He evaluated "Cross Creek" most highly and thought the estimation of the plaintiff contained in the book was a most kindly portrait. A prominent lawyer, not otherwise connected with the case, testified that in his opinion he regarded "Cross Creek" as a very accurate character portrayal of the type of people with which it purported to deal, enlivened and enriched by the genius of the writer. Some witnesses who were portrayed in the book testified that they had no objection to the passages of the book relating to them. A sailor in the act of abandoning ship, on the occasion of the sinking of the illustrious USS Lexington, in the South Pacific, stated that at the last moment he went back to his compartment, procured a copy of "Cross Creek" and went over the side, on an order to abandon ship, with his life jacket and a copy of "Cross Creek." The witness did not indicate which he thought was more valuable. A literary agent told of the distribution of the book in foreign lands and of the remuneration received by the

defendant. An editor and writer, Chairman of the Board of Judges of the Book of the Month Club, told of the acceptance of some of the books of the defendant. He thought "Cross Creek" was one of the most humorous and kindly, as well as one of the most realistic books of this kind he had ever read, and he further said that the book reviews involving "Cross Creek" were definitely favorable. The eminent publisher of "Cross Creek" testified that the book sold for $2.50, with the trade getting an average of 42% discount and the defendant 15% of the gross. He said the publication of the book had been profitable, but that it had been published and distributed with knowledge that one or more persons described in the book had not consented to the publication. A manager of a firm that prepared books for service men testified that over 50,000 copies were distributed in 1944 and over 140,000 copies in 1945. Another editor, who had been with the publisher thirty-six years, stated that in going over the preliminary drafts of the book he raised questions about material to which there was likely to be objection by any of the characters presented. These were objections as to whether they would be offended, or, in some cases, whether there would be possible action for libel. He stated he did not think that many modifications were made. Other witnesses testified as to their high regard for the book. The defendant also called a number of witnesses concerning the affairs and activities of the plaintiff. This evidence failed to show that she had ever, by course of conduct or otherwise, lost her right of privacy, or that she was other than a person who lived a quiet and private life, free from the prying curiosity which accompanies either fame or notoriety, until the publication of "Cross Creek."

Many exhibits were offered by the defendant, including a copy of "Cross Creek"; an honorary degree citation; copy of a booklet issued in connection with the Florida Centennial; citation from a university, when the degree of Doctor of Literature had been conferred upon Mrs. Baskin; two pictures of the Rawlings Literary Room, at another university, one being a picture of a mural depicting a boy and a deer jumping a stream; copy of defendant's write-up in "Who's Who";

citation and honorary degree conferred upon the defendant by a university; excerpts from the Minutes of the Board of Public Instruction of Alachua County, as to the plaintiff; photographs of the defendant's home, and a number of book reviews clipped from various publications.

Personal rights of the plaintiff are not to be tested by the status or identity of the defendant. The whole force and trend of the defendant's evidence was to exalt and praise the defendant and to establish her great prominence—when that was not an issue in the case. No legitimate or general public interest in the defendant alone can justify an invasion of the right of privacy of another, who has in no sense of the word consented to that invasion or waived her rights.

We, therefore, conclude that this evidence was prejudicial to a fair trial of this cause. It tended to confuse the jury and withdraw its consideration from the issue as to whether or not the plaintiff was one concerning whom there was a general and legitimate public interest, rather than defendant. Hence the judgment for the defendant should be reversed.

A consideration of the evidence as a whole, however, fails to show that plaintiff has offered any substantial evidence to show that she is entitled to any actual or compensatory damages. Her health has not been impaired — in fact she gained some twenty pounds in weight since the book was published. Plaintiff did testify that she had been teased about the book, and that she had discontinued the use of "Zelma," using the words "Miss Cason" when she answered the telephone, and that she thought the publication of the book had upset her. There was no mental anguish—no loss of friends or respect in the community—no injury to character or reputation. The evidence fails to show any malice on the part of the defendant and fails to show that plaintiff has sustained any substantial injury.

Under Section 59.34, Florida Statutes, 1941, it is the duty of the appellate court to examine the record on appeal and to give such judgment as the court below should have given, or as to it may appear according to law. In Tampa Electric Co. v. Ferguson, 93 Fla. 375, 118 So. 211, the Court held in a tort action, in which a verdict had been rendered for the

defendant, that there was ample evidence to support the finding that plaintiff sustained no substantial injury whatsoever, and directed that a judgment be entered for the plaintiff for nominal damages. Where nominal damages go to establish some question of permanent right, or entitle plaintiff to costs, a new trial may be awarded for an erroneous failure to give nominal damages. 8 A. & E. Encyl. of L., 2d ed., 360; Kirkland v. City of Gainesville, 122 Fla. 765, 166 So. 460.

This case has been in the courts for almost four and one-half years. No doubt the parties have expended a considerable sum in the course of this litigation, preparing the case for trial and in having counsel attend to the many matters that necessarily arise in a case of this nature and that are essential to the prosecution or the defense. It is the desire of courts to bring an end to litigation at the earliest possible date, in so far as this can be accomplished under established principles of law.

We, therefore, hold that, while the evidence vindicates plaintiff, in establishing a wrongful invasion of her right of privacy, and shows no justification for the invasion of this right by the defendant author, yet it does not show that the plaintiff has thereby sustained any actual or compensatory damage as a result of the publication by defendant, nor is she entitled to punitive damages.

The final judgment is reversed, and a new trial is ordered granted, with directions that plaintiff recover only nominal damages and all costs.

Reversed.

THOMAS, C. J., BUFORD and BARNS, JJ., concur.

TERRELL, CHAPMAN and ADAMS, JJ., dissent.

CHAPMAN, J., dissenting:

On a former appeal we reviewed an order of the trial court holding legally insufficient four counts of plaintiff's declaration. Two of these counts were based on an alleged invasion of plaintiff's right of privacy or, as some authorities express it, the right to be let alone. It was our view that the challenged order and final judgment for defendant below were erroneous as to count two. This count is set out verbatim in

our original opinion. Cason v. Baskin, 155 Fla. 198 (text pp. 200-205), 20 So. (2nd) 244-246. Mr. Justice BROWN (now retired), then speaking for the Court, pointed out that an action for the invasion of the right of privacy had certain limitations prescribed by the fundamental law of both the State and Nation, thereby recognizing the right of the general public to be protected in receiving news and information, likewise the freedom of speech and the press, together with the right of every person to speak or write his sentiments on all subjects. Section 13 of the Declaration of Rights.

There was not presented for the consideration of the Court on the former appeal, neither did we attempt to set out or define, just what defense or defenses that could or may be interposed by a defendant to an action for the invasion of the right of privacy, but on the subject, we, in part, said (text 155 Fla. 220) :

"On the record as it stands, it would be inappropriate for the court to now adjudicate the question as to whether the book 'Cross Creek' including that portion of it quoted in plaintiff's declaration, is one dealing with matters 'of general or public interest.' That is a question which is not squarely presented by this record. It is defensive matter, unless it so clearly appears from the plaintiff's declaration as to show that plaintiff has no cause of action, in which case it could be reached by demurrer. And when pleaded as a defense, it frequently presents a mixed question of law and fact, as shown by the authorities. It is true, the first count of the declaration alleges plaintiff's conception of the nature and characted of defendant's book, but we have held that the trial court was, for another reason, free from error in striking down the first court. Nor is the question presented here by demurrer, and it is very doubtful if it could have been so presented. Indeed, there is nothing in this record to show that the trial court ever considered or ruled upon this question."

The jury in the court below heard the evidence adduced by the respective parties in support of the several issues made by plaintiff's second count and defendant's pleas 1, 3, 11, 14, 16, and amended 17th. The jury heard oral argument of counsel,

and after being instructed by the trial court upon the applicable law, returned a verdict for the defendant and plaintiff appealed.

It is contended by counsel for appellant that the trial court erred when charging or instructing the jury on the law applicable to certain issues made by the plea of not guilty of the defendant directed to count two of plaintiff's declaration. Instructions complained of are viz:

"The defendant has filed to the plaintiff's declaration six pleas, the first being the plea of not guilty. *This plea denies only the breach of duty or wrongful act alleged, and the damages alleged to have been suffered by the plaintiff.*

"In other words, this plea denies that the defendant has violated the plaintiff's right of privacy either maliciously, or otherwise, and it *denies that the defendant has caused the plaintiff any damages whatsoever.*

"The plaintiff alleges in her declaration that the defendant 'willfully and maliciously' wrote about her in the book, 'Cross Creek.' 'Willfully' means done intentionally or on purpose. 'Maliciously' means either that the defendant was motivated by ill will or spite toward the plaintiff in committing the act complained of, or that she did so being well aware at the time that she was deliberately, wantonly, and unlawfully violating a legal right of the plaintiff.

" 'Malice' being a state of mind, you must determine its existence on the part of the defendant in writing and publishing what she did about the plaintiff in 'Cross Creek' not only from the writing itself, but also from all the surrounding facts and circumstances appearing from the evidence in the case.

" 'Malice'; however, is not an essential element of the plaintiff's case, and she may recover even though you find there was no malice on the part of the defendant. The question of malice only affects the amount of damages the plaintiff may recover." (Emphasis supplied).

Section 52.19 Fla. Stats. 1941 (FSA) provides: "In actions of torts, the plea of not guilty shall operate as a denial only of the breach of duty or wrongful act alleged to have been committed by the defendant, and not of the facts stated

in the inducement, and no other defense than such denial shall be admissible under this plea. . . . " It is settled law that the plea of not guilty in a tort action operates only as a denial of the breach of duty or the wrongful act as alleged. Great Atlantic & Pacific Tea Co. v. Dallas, 141 Fla. 206, 192 So. 867; Thomas v. Western Union Tel. Co., 129 Fla. 155, 176 So. 122. The instructions here challenged by the trial court on the issue made by a plea of not guilty in a tort action are viz: "This plea denies only the breach of the duty or wrongful act alleged, *and the damages alleged to have been suffered by the plaintiff*. In other words, this plea denies that the defendant has violated the plaintiff's right of privacy either maliciously or otherwise, *and it denies that the defendant has caused the plaintiff any damages whatsoever."* (Emphasis supplied). It must be admitted that the challenged instructions go further than authorized by statute or the decisions of this Court. Such instructions preclude a finding for the plaintiff of nominal damages by the jury, contrary to our holding in Tampa Electric Co. v. Ferguson, 96 Fla. 375, 118 So. 211. We cannot hold that the instructions as given constitute reversible error, but on retrial the objectionable portions of the charge may be deleted.

Counsel for appellant demurred to plea 14 and contended (a) the facts alleged were legally insufficient; (b) it was repetitious; (c) it tendered irrelevant and immaterial issues. The trial court overruled the demurrer and motion to strike this plea, which is viz:

"14. The plaintiff was for many years prior to said publication of the book 'Cross Creek' an intimate friend and frequent companion of the defendant author and well knew that the defendant author was constantly and continuously engaged in writing books and short stories about the country in which and the people among whom they lived. The plaintiff frequently assisted the defendant author in gathering material for her literary productions and otherwise promoting the productions of such books and stories. By reason of said facts and circumstances plaintiff knew or should have known that she might reasonably appear as a character or prototype in one or more of the author's books or stories. Plaintiff in-

vited defendant author to accompany plaintiff on the trip, the experiences of which are narrated in the said publication of which plaintiff complains, for the specific purpose of gathering material for literary productions by the defendant author without appraising defendant author of plaintiff's desire, as alleged in said count, to be excluded from any book or story in which the defendant author might use the material gathered on such trip with plaintiff and with plaintiff's assistance."

It was the view of the trial court that plea 14 *supra* set up the implied consent of the plaintiff to be character by defendant in "Cross Creek" as set out in count two of plaintiff's declaration and her consent thereto had been obtained and for this reason the plea was a complete bar to plaintiff's cause of action. We hold that plaintiff's consent to and approval of the characterization as set out in "Cross Creek" is a bar to the action and is a question of fact for the jury under appropriate instructions. In the case of Thayer v. Worcester Post Co., 284 Mass. 160 187 N.E. 292, it appears that a woman posed for her picture to be taken, along with others, and after the same had been published she sued in an action for the invasion of privacy and the court held that she could not recover because she had approved and consented to the publication by posing for her picture to be taken. This assignment is without merit.

The trial court sustained Pleas 3 and 16 against plaintiff's motion to strike and demurrer on various grounds. The pleas are viz:

## PLEA 3

"3. They deny and say it is not true that 'before and at the time of' the publication complained of 'plaintiff has ever shunned and avoided notoriety and publicity, has ever cherished and held as precious the privacy of her personal life and of her acts and sayings in all her social relations;' and defendants allege that plaintiff, before said publication, constantly took an active and aggressive interest in the following listed public affairs of the State of Florida, and of the communities in which she lived and thereby invited public interest in and comment about her acts, doings and sayings: Census taker and representative of the Federal Emergency

Relief Administration in the employ of the United States Government; visitor in employ of Florida State Welfare Board in Alachua, Putnam, St. Johns and other counties in the State of Florida; business woman; fraternal order, holding office in local lodge and attending district meetings; church; school; civic; social; law enforcement; politics, particularly in primary elections; selection and removal of teachers in graded schools and others."

## PLEA 16

"16. The plaintiff is not known or recognized in the community in which she lives as the personality described in the said court, but on the contrary is known and recognized among her friends and acquaintances in Island Grove, Cross Creek and elsewhere as a forthright, outspoken person of strong and definite convictions, aggressively interested in all matters of general public interest and given to the frequent and vigorous expression of her views on such questions privately and publicly; by reason whereof defendant author had reason to believe and did believe that plaintiff would be pleased by the portrayal of her in 'Cross Creek' which defendant author reasonably considered to be a correct and favorable presentation, and had no reason to believe it would offend or injure plaintiff."

Counsel for appellants contend that the two pleas, supra, are unprecedented in Florida pleading and practice. The language appearing in the Court's order, at page 21 of the transcript, sustaining the pleas, is cited by counsel, viz: "The matter in the book 'Cross Creek' complained of by plaintiff relates to her act and sayings while employed as census enumerator, although it can hardly be said that it was written for the purpose of apprising the public as to her (plaintiff's) fitness for such position. Employment as mere census enumerator does not make one a public personage so as to impair his right of privacy." . . . "Plaintiff's combined activities as F. E. R. A. employee social worker with the State Welfare Board, as a business person and participant in the social, fraternal, cultural and civic affairs of her community, as alleged in said (3 and 16) pleas do not make her a public

personage within the contemplation of the law of privacy so as to thus impair her right of privacy."

In commenting on Plea 3 to the jury, the trial court said:

"The third plea is a plea in mitigation of damages and not a complete bar or defense to plaintiff's action. Its effect is to put the plaintiff to proof of those allegations in her declaration which are denied by the plea and to enable the defendant to submit proof showing the various alleged activities of the plaintiff, in order to advise the jury as to the nature, character, personality, and activities of the plaintiff, and as to her station in life and the general environment in which she lived; all, so that the jury can properly appraise the damages suffered by the plaintiff if you find in favor of the plaintiff."

The Court's comments on Plea 16 to the jury are:

"The effect of the sixteenth plea is to deny malice on the part of the defendant. This plea is not a complete bar on defense to the plainitiff's action, but if you find from the evidence the facts alleged therein to be true then the defendant would not be guilty of any malice, and the plaintiff would not be entitled to recover exemplary or punitive damages in the event you find for the plaintiff."

Our study of the record suggests the conclusion that the court below, in ruling upon the legal sufficiency of Pleas 3 and 16, supra, recognized certain defenses to tort actions to recover for the invasion of the right of privacy. The *first* being "Who is a public personage?" The answer is any person who engages in any pursuit or occupation, by his accomplishments, fame, or mode of life, or by adoption of a profession or calling which gives the public a legitimate interest in his doings, his affairs and his character, may be said to have become a public personage, and he thereby relinquishes or loses at least a part of his right of privacy. William James Sidis v. F. R. Publishing Corporation, 113 Fed. (2nd) 806; writ of certiorari denied in 311 U.S. 711, 85 L. Ed. 462, 61 S. Ct. 393, 138 A.L.R. 15, and Annotations, p. 58; 41 Am. Jur. 937, par. 18. The authorities hold that the following, in part, fall within the above rule: (a) Candidates for office; (b) high officials of a State or Federal Government; (c) famous baseball players; (d) singers; (e) dancers; (f) teachers; (g) writers; (h) individuals convicted

or charged with crime; (i) musicians; and many others. We agree with the trial court's comments that Plea No. 3 failed to allege sufficient facts to make plaintiff a public personage. Defendant should be permitted, however, to amend Plea No. 3, if desired, so as to come within the rule supra.

*Second:* The right of privacy does not prohibit the publication of matter which is of a legitimate public or general interest. It is true that at some point the public interest in obtaining information becomes dominant over the individual's desire of privacy. It is recognized that the truth may be spoken, written or printed about all matters of a public nature, as well as matters of private nature, in which the public has a legitimate interest. William James Sidis v. F. R. Publishing Corp., supra; 41 Am. Jur. 935, par. 14.

The right of privacy stated by Warren and Brandeis, 4 Harvard L. Review, pp. 193 to 220, and at text page 214 says:

"The right to privacy does not prohibit any publication of matter which is of public or general interest . . . The design of the law must be to protect those persons with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity and to protect all persons whomsoever; their position or station, from having matters which they may properly prefer to keep private, made public against their will."

It is admitted that some of the most common means of invasion of the rights of privacy are viz: (a) the unauthorized use of portraits of persons; (b) unauthorized humorous cartoons and sale for profit and gain; (c) sale of X-ray photographs of plaintiff's abdomen; (d) publication of private diary; (e) personal letters of a private nature, etc. The defendant should be allowed an opportunity to amend Plea No. 16, if desired, so as to come within the last stated rule.

Counsel for appellant attacked Plea No. 11 by demurrer and motion to strike, and this plea was by the trial court sustained. It is viz:

"The portrayal of the plaintiff in the book "Cross Creek" of which plaintiff complains was of such a nature that neither the author nor any reasonable person could reasonably antici-

pate it might or probably would cause mental distress and injury to any one possessed of ordinary feelings and intelligence situated in like circumstances as the plaintiff. By reason whereof said publication did not constitute an actionable invasion of plaintiff's alleged privacy."

The trial court charged the jury that Plea No. 11 is a plea in bar: "If the defendant sustains this plea by a preponderance of the evidence then your verdict should be for the defendant."

Defendant's 11th Plea fails to traverse or deny any allegation of plaintiff's second count, but confesses that defendant's portrayal of the plaintiff in her book "Cross Creek" was of such a nature that the author nor any reasonable person could reasonably anticipate the mental distress and injury to the feelings of the plaintiff or any one possessed of ordinary feelings and intelligence situated in like circumstances as the plaintiff. Therefore, the publication of plaintiff by defendant in "Cross Creek" does not constitute an actionable invasion of plaintiff's privacy. Counsel for plaintiff contend that the law of the case was settled as to the sufficiency of count two of the declaration on the former appeal and Plea No. 11 in effect repudiates and holds for naught our conclusion as to the sufficiency of count two stating a prima facie case. We in part said in Cason v. Baskin, supra (text 155 Fla. 207):

"Our conclusion is that, in spite of the fact that the publication complained of, considered as a whole, portrays the plaintiff as a fine and attractive personality, it is nevertheless a rather vivid and intimate character sketch, and the allegations of count two taken as a whole if proven to be true would make out a prima facie case of an invasion of the right of privacy such as would authorize the recovery of at least nominal damages, unless this case falls within one of the recognized exceptions to our limitations upon that right, both of which questions we shall presently discuss."

The defendant's 17th amended plea was by the plaintiff attacked by both motion to strike and demurrer, but the trial court, in an appropriate order, sustained the same. This plea, in effect, alleged that the defendant had engaged in journalistic and literary work and since 1928 had written books and

stories about Florida and the lives of people in the section of Florida where she lived, and these had been widely read; that her book "The Yearling" was popular and had been widely read and praised and was published in ten American editions. The Book of the Month Club selected "The Yearling" as one of the best books published. It was appraised as "a Minor American Classic." It was published in the native language of several foreign countries. The defendant reasonably believed that the public would be interested in her autobiography covering the period of time that she was in the section of Florida (around Island Grove) when engaged in writing her book "Cross Creek."

That her book "Cross Creek" was published in 1942 and was well received and more widely read in the United States and England than had been her book "The Yearling." Its circulation was three times larger than "The Yearling" and was published in the Armed Services Edition. The comments on "Cross Creek" by the literary critics throughout the Armed Services were favorable and extensively received, especially as to the pen portrayal of the plaintiff. The quoted portions of the book about the plaintiff were of such a nature that it should not injure or offend plaintiff or any person of ordinary feelings and intelligence, situated in like circumstances as was plaintiff.

"The defendant author did not have reason to believe and did not apprehend that the publication of the portions of her said book quoted in said count could or would cause mental distress or injury to plaintiff. By reason whereof the defendants say that the things and people about which the defendant author wrote in said autobiography are matters of legitimate general public interest, and she was privileged to publish the matter complained of under Section 13 of the Declaration of Rights in the Constitution of the State of Florida."

In support of Plea 17, as amended, the court instructed the jury viz:

"By this plea the defendant in effect claims she has not violated plaintiff's right of privacy because under Section 13 of the Declaration of Rights of the Florida Constitution, which guarantees freedom of the press, she was privileged to write

what she did about the plaintiff, under the circumstances alleged. But our Constitution also guarantees to the individual the right of liberty and the pursuit of happiness, and a remedy in the courts to every person for an injury done him in his person. Upon these guarantees the legal right of privacy is largely based.

"So it is, that in cases of this type frequently there arises a conflict between the right of the public to freedom of the press on the one hand and the right of the individual to privacy on the other. Neither right is absolute, and in matters in which the public has a legitimate interest the right to free expression is sometimes dominated over the individual's desire for privacy.

"By 'legitimate public interest' is meant a widespread interest, not merely local in character; a genuine interest, not mere curiosity.

"If you find from a preponderance of the evidence that the defendant reasonably believed that the public would have, and that the public did have, a legitimate interest in the subject matter of the book "Cross Creek" because of the fame of the author and the literary merit and popularity of her works as a writer of books and short stories based on the section of Florida in which she lives and upon the lives of the people among whom she lives, and that it was reasonably necessary for the defendant to relate her experiences with certain of her neighbors and acquaintances in order to give a real and interesting account of her life in Florida covering the period mentioned in the book; then the Court charges you that the defendant was privileged to so write about these people in the book "Cross Creek" without subjecting herself to liability for so doing.

"This does not mean, however, that the defendant, under the mantel of 'public interest,' could write whatever she pleased about these people regardless of how certain she was to offend or injure them. And if you find that the defendant had reason to believe and did apprehend that the matter so written and published concerning the plaintiff would cause mental distress and injury to the plaintiff, as a person of ordinary feelings and intelligence, situated in like

circumstances as the plaintiff, then the defendant would not be immune to liability for so doing."

It is our view that Plea 17, as amended, tenders irrelevant, immaterial and collateral issues. The autobiography of the defendant during the period she resided and was writing in the State of Florida cannot be a materal issue in this controversy. The popularity and literary merits of her several writings, coupled with the favorable and unfavorable opinions of literary critics as to the merits or demerits thereof, at the most are but collateral issues. We hold (1) that the plea of not guilty is properly in the record; (2) Plea 14 permits or allows the defendant to establish the fact that plaintiff consented to and approved her characterization as set out in defendant's book, "Cross Creek"; (3) Plea 3 of defendant may be amended, if desired, so as to establish that the plaintiff (Miss Zelma Cason) is such a public personage as would give the general public a legitimate interest in her doings, character, and private affairs; (4) Plea 16 may be amended, if desired, so that the defendant may establish that the private life of the plaintiff is of such a legitimate public or general interest that it becomes dominant over her desire of privacy. 41 Am. Jur., pp. 923 to 951, Vol 4, Harvard Law Review, pp. 193 to 220; Reed v. Real Detective Publishing Co., 63 Ariz. 294, 162 P. (2nd) 133; William James Sidis v. F. R. Publishing Corporation, supra, and Annotations, 138 A. L. R., pp. 22 to 110.

I think the trial court erred in overruling plaintiff's demurrer to defendant's pleas 11 and 17, as amended, and that the judgment should be reversed and a new trial awarded.

ADAMS, J., concurs.