83 So.2d 34 (1955)
John JACOVA, Appellant,
v.
SOUTHERN RADIO AND TELEVISION COMPANY, a Florida corporation, Appellee.
Supreme Court of Florida, Special Division A.
October 26, 1955.
Sommer, Frank & Weston, Ader & Young and Burton Young, Miami Beach, for appellant.
*35 Bernstein & Hodsdon, Miami, for appellee.
ROBERTS, Justice.
The plaintiff has appealed from a summary judgment entered in favor of defendant in a suit for damages filed against it by plaintiff, based on the following incident: In a news telecast presented to the television audience by defendant, entitled "Renick Reporting," the defendant showed a "canned" film depicting a gambling raid on a restaurant in Miami Beach, followed by another raid on a hotel there. Accompanying the film was a narrative account by Renick of the activities of the officers during these raids, the text of which is as follows: 
 "Jan. 3, 1954.
 "Renick Reporting
"A raiding party of state and local law enforcement agents swooped down on a Miami Beach 23rd Street restaurant yesterday arresting a Buffalo ganster on gambling charges:
"Representatives of the State Attorney General's, Dade Sheriff's and State Attorney's office here raid Sonny's Chicken and Barbeque House  320 23rd Street, Miami Beach.
"Deputy sheriff Dayton Blackford frisks one of the suspects. Sam DeCarlo  former Buffalo New York racketeer told officers he was unemployed. He had nearly two thousand dollars in his pockets. John Tronolone  operator of the restaurant was the other person arrested at the address. Both men were charged with operating a gambling house  violation of state beverage laws and resisting arrest.
"The other men found in the restaurant were released after questioning.
"Five partly filled bottles of whisky had been purchased to give free holiday drinks to his customers said Tronolone.
"Buddy Gasque, John Reed, Bill Culbreath and Ed McMullen of the Attorney General's Office, Fred Jones of the State Attorney's Office and Deputy Sheriff Blackford comprised the raiding party.
"Tronolone's cousin Carmen was arrested at his apartment by other officers. Then raiders visited the cigar shop of the Casablanca Hotel looking for a man reputedly accepting bets there. Two young women employees were questioned and released  they disclaimed any knowledge of bookmaking operations there; however, one bellboy was arrested on a bookmaking charge."
The plaintiff alleged in his complaint that, immediately prior to the comment that "Tronolone's Cousin Carmen was arrested at his apartment by other officers", his picture was exhibited to the entire television audience; that he was, in fact, miles away from the "aforedescribed scene and was not in any manner involved in the `gambling' raid or the `arrest'," as filmed and exhibited by the defendant, and that the defendant in the exercise of reasonable care in exhibiting the "canned" film should have so determined. He alleged that his right of privacy had been invaded, injuring him in various enumerated ways, and that he has been "`tagged' and is identified as an alleged gambler to the public's notice and attention, which is false and obnoxious to Plaintiff". He claimed damages for personal injuries and for injury to his business.
The deposition of the plaintiff was taken, and this, together with the film and narrative comprising the newscast, was submitted to the trial judge in support of the defendant's motion for summary judgment. As noted, the motion was granted, and plaintiff has appealed.
In his deposition, plaintiff stated that he was present at the cigar shop at the hotel during the time of the second raid, where he had stopped by for a newspaper on his way home. He said, "I was looking over the newsstand, and suddenly several men moved in fast, and one pushed me up against the wall, and started reading the paper to *36 me, and claimed I was a man by the name of Tony, and running a gambling establishment there; and then he asked me for identification, and I pulled out my wallet, and I gave it to him." The film shows the plaintiff standing against the wall, with one or two men, presumably the officers, talking to him. The photograph of plaintiff and the two officers occupies the entire screen, with a corner of the cigarette counter in the cigar shop being visible in some of the shots. The scenes showing the plaintiff consumed several seconds of the film  not more than twelve or fifteen, according to the statement of defendant's counsel in brief  and were flashed on the screen immediately following the scene in the restaurant showing the raiding officers during their identification by the narrator. The film then switched to activities outside the cigar shop, and then back inside for a picture of the officers interrogating the young women employees.
At the outset, it should be noted that plaintiff's contention in his brief that he was "depicted as being arrested as a gambler" by the telecast in question cannot be sustained. No reasonable person could have inferred that the plaintiff was "Tronolone's Cousin Carmen" who was being "arrested at his apartment by other officers." The background had no look of an apartment, and the corner of the cigarette counter in the cigar shop was clearly visible in most of the scenes involving plaintiff. It could certainly not be inferred that he was the bellboy who the narrator stated was "arrested on a bookmaking charge" during the raid on the hotel. On the other hand, it is not clear that plaintiff was simply an "innocent bystander"  admitted to be so by defendant  who happened to be in the cigar shop at the time of the raid. So far as the telecast showed, he was just an unidentified person, standing against the wall and apparently being interrogated by the officers. While this was not sufficient to "tag" him as a gambler, as contended by plaintiff, it was enough to show that he was under suspicion of being involved in the gambling activities for which the officers were searching  and, in fact, the plaintiff's deposition shows that this was exactly what happened.
The defendant's argument here is that, since the telecast did not falsely depict the plaintiff as "being arrested as a gambler" or "tag" him as a gambler, it was privileged to publish his photograph because he became an actor in a newsworthy event, to wit, a gambling raid, and as such has no standing to claim an actionable invasion of his right of privacy under principles of law established in other fields of news dissemination, such as newspapers, magazines, newsreels and the like. And it is true that it is settled law in this state  as in other states in which an action for invasion of privacy is recognized  that as to these fields the right of privacy does not necessarily protect a person against the publication of his name or photograph in connection with the dissemination of legitimate news items or other matters of public interest. Cason v. Baskin, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430; Id., 159 Fla. 31, 30 So.2d 635. Or, as stated by some courts, "Where one, whether willingly or not, becomes an actor in an occurrence of public or general interest, he emerges from his seclusion, and it is not an invasion of his `right of privacy' to publish his photograph with an account of such occurrence." Metter v. Los Angeles Examiner, 1939, 35 Cal. App.2d 304, 95 P.2d 491. Accord: Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972; Berg v. Minneapolis Star & Tribune Co., D.C.Minn. 1948, 79 F. Supp. 957.
This rule has been applied to actions involving newsreels, Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 178 N.Y.S. 752, and to radio broadcasts, Smith v. Doss, 1948, 251 Ala. 250, 37 So.2d 118; Elmhurst v. Pearson, 80 U.S.App.D.C. 372, 153 F.2d 467. It was applied in the only two cases involving a television broadcast which have come to our attention, Gautier v. Pro-Football, Inc., 1952, 304 N.Y. 354, 107 N.E.2d 485; and Ettore v. Philco Television Broadcasting Corp., D.C.Pa. 1954, 126 F. Supp. 143. And, since television is the latest medium for the dissemination of news, there is every reason for and no *37 reason against applying to television news broadcasts the same rule.
We hold, then, that a television company  as in the case of a newspaper, newsreel, or other communication medium  has a qualified privilege to use in its telecast the name or photograph of a person who has become an "actor" in a newsworthy event.
But the problem does not end here. Just what are the bounds of the privilege? When does a person become an "actor" in a matter of public interest so as to justify an invasion of his or her privacy? Such questions will pose difficult problems in cases involving "on-the-spot" television broadcasts, and these are discussed at some length by Warner in his work on "Radio and Television Rights" (1953), Section 270, page 1129 et seq. He cites as an illustration the case (which has not yet reached the courts) of the football fan who attends a football game that is being telecast directly to the television audience, becomes intoxicated, gets into a fight, and is escorted from the stadium  all of which is recorded by the television camera. The annotator in 15 A.L.R.2d, at page 794, hypothesizes the situation of "the businessman whose likeness, complete with blond companion, is reflected on his irate wife's television screen in a program from a sports event or night club, at a time when he is purportedly working late at the office." These and similar situations will no doubt eventually find their way to the courts and, as stated by Warner in his work, ibid., will "tax the ingenuity of the courts in balancing the private rights of an individual against the public rights of society."
In Gautier v. Pro-Football, Inc., supra, 107 N.E.2d 485, 489, the New York court discussed "the area of privacy which may not be invaded even in this modern era of television", as follows:
"One traveling upon the public highway may expect to be televised, but only as an incidental part of the general scene. So, one attending a public event such as a professional football game may expect to be televised in the status in which he attends. If a mere spectator, he may be taken as part of the general audience, but may not be picked out of a crowd alone, thrust upon the screen and unduly featured for public view. Where, however, one is a public personage, an actual participant in a public event, or where some newsworthy incident affecting him is taking place, the right of privacy is not absolute, but limited. * * *"
We are here concerned, however, with a "canned" film, where the telecaster has the same opportunity to edit and "cut" as does the editor of a newspaper or magazine or the producer of a motion picture or newsreel. In such case, the television company should be held to the same degree of care in invading the individual's right of privacy, under its qualified privilege to do so, as are the editor and producer referred to above, and the cases involving these fields of communication may properly be considered here.
In the only case in this jurisdiction involving a cause of action for invasion of the right of privacy, Cason v. Baskin, supra, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430; Id., 159 Fla. 31, 30 So.2d 635, the facts are not sufficiently analogous to be of much help. There, the plaintiff was allowed to recover nominal damages because the defendant had used her name and depicted her personality in a book authored by defendant, against the plea by defendant that the things and people about which defendant wrote in the book (which was autobiographical in nature) were matters of legitimate general public interest and thus privileged. The court said in 30 So.2d at page 638, that the plea failed to show any "pre-existing legitimate general or public interest in the plaintiff," and that the defendant could not "create a public interest in an area or a community, and thereby justify the invasion of privacy of one who happens to live in that particular area or community."
We have also examined the cases cited by the parties in support of their respective *38 contentions and have made an independent research of the question. No case exactly in point has been cited or found. Of the cases cited by defendant, three were concerned with an action by a plaintiff for invasion of his or her privacy by the publication of a photograph or a news item concerning the plaintiff's decedent. See Metter v. Los Angeles Examiner, 1939, 35 Cal. App.2d 304, 95 P.2d 491; Kelley v. Post Publishing Co., 1951, 327 Mass. 275, 98 N.E.2d 286; and Smith v. Doss, 1948, 251 Ala. 250, 37 So.2d 118. These cases are obviously not applicable here. In the other cases cited by defendant, the plaintiffs each initiated the activity which made them the subject of legitimate comment and did not, as in the instant case, occupy the position of "innocent bystander" until the role of "actor" was thrust upon them by mistake. Thus, in Berg v. Minneapolis Star & Tribune Co., D.C.Minn. 1948, 79 F. Supp. 957, the defendant took a picture of plaintiff and his lawyer in the court room and published it in connection with an account of court proceedings in which plaintiff was involved. In Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972, 973, plaintiff's husband was killed while she and her husband were walking along the street. Plaintiff attacked and struck the men before they escaped. The defendant newspaper described the event and published plaintiff's picture. In holding that no cause of action was stated, the court said "On the whole, we conclude that the publication of the photograph in connection with the language attributed to Mrs. Jones [the plaintiff], even though she was incorrectly quoted, was not an invasion of her right of privacy." (Emphasis added.) In Humiston v. Universal Film Mfg. Co., 189 App. Div. 467, 178 N.Y.S. 752, the plaintiff assisted the police in the solution of a murder mystery and was photographed while seated in an automobile with a police officer. This photograph was published and her name mentioned in a newsreel by defendant showing other persons and scenes connected with the murder. It was held that no cause of action for invasion of privacy was shown under the New York statute which allows recovery for the use of a person's name and picture for advertising or trade purposes without their written consent. The New York courts hold that the use of a person's name or photograph in a newspaper, newsreel, and the like, in connection with an item of news or one that is newsworthy is not a use "for purposes of trade" within the meaning of their statute [Civil Rights Law, McK.Consol.Laws, § 50]. Gautier v. Pro-Football, Inc., supra, 107 N.E.2d 485, 488.
Of the cases cited by plaintiff, those involving libel are not in point because, as heretofore shown, there was no reasonable inference that plaintiff was "depicted as being arrested as a gambler." The other two, Leverton v. Curtis Publishing Co., 3 Cir., 192 F.2d 974, and Sutton v. Hearst Corp., Sup., 90 N.Y.S.2d 322, 323, are authority for the proposition that the mere fact that one is the subject of legitimate news comment does not relieve the publisher of liability for invasion of privacy under all circumstances. Thus, in the Leverton case, the plaintiff was photographed as she lay in the street after having been struck by an automobile, and the photograph was used later in an article depicting traffic accidents with headlines falsely indicating that the plaintiff was careless and responsible for her plight. The appellate court affirmed a judgment in plaintiff's favor. In the Sutton case, the defendant published in the magazine section of its paper a dramatized account of a news story concerning plaintiff, accompanied by an artist's drawing of plaintiff "`with a red rose in her hands, cupping it, tenderly, near her lips, with a wistful expression in her eyes.'" Plaintiff alleged that the text of the article was fictitious, as well as the artist's conception in the drawing. The New York court held that a cause of action was stated, because "it, might well be found by the trier of facts to go far beyond the scope of the immunity pertaining to the publication of current or past news."
In another case brought under the New York statute, Blumenthal v. Picture Classics, 235 App.Div. 570, 257 N.Y.S. 800, affirmed 261 N.Y. 504, 185 N.E. 713, a motion picture company filmed a picture purporting *39 to portray picturesque parts of the city of New York, which it sold, distributed and displayed for trade purposes to local motion picture theatres. Included was a close-up full-sized picture of plaintiff vending bread and rolls on the street, shown for a period of some six seconds. The New York court allowed recovery, as against the contention that it was a publication of a newsworthy item, saying that the connection with a news event must be a legitimate one, and that the individual may not be singled out and unduly featured merely because he is on the scene.
And in Metzger v. Dell Publishing Co., 1955, 207 Misc. 182, 136 N.Y.S.2d 888, 891, the plaintiffs were photographed by defendant's employee while standing on the street. The picture was one of several taken in the area by the employee which were used as "local color" in connection with a story, entitled "Gang-Boy," published in defendant's magazine. The photograph did not identify plaintiffs by name. The court allowed recovery as for an invasion of privacy under the New York statute referred to above, saying: "The fact that it is legitimate to discuss the existence of gangs and gangsters does not make it legitimate to drag these plaintiffs into the discussion."
In Barber v. Time, Inc., 1942, 348 Mo. 1199, 159 S.W.2d 291, 295, the plaintiff's name and picture were published by defendant in its magazine in an article describing an unusual ailment suffered by plaintiff. The court recognized that the disease was the subject of legitimate news comment but pointed out that the facts could have been presented to the public without mentioning plaintiff's name or showing her picture. The court said: "* * * whatever may be the right of the press, tabloids or news reel companies to take and use pictures of persons in public places, certainly any right of privacy ought to protect a person from publication of a picture taken without consent while ill or in bed for treatment and recuperation."
The cases in which recovery has been denied are illustrated by Samuel v. Curtis Pub. Co., D.C.Cal. 1954, 122 F. Supp. 327, 328. There, the plaintiff was photographed while attempting to dissuade a young woman from committing suicide, and the photograph was published in a newspaper the day of the suicide. Two years later, the photograph and plaintiff's name were used by defendant in connection with an article on suicides, as an illustration of the various types of suicide. The court said that the photograph was newsworthy, and thus privileged, when first published, and the mere passage of two years of time did not destroy this privilege. It was also stated that there was no reason to believe that a person of ordinary sensibilities would be offended by the publication of the picture. The court referred to the rule that "An invasion of the right of privacy occurs not with the mere publication of a photograph, but occurs when a photograph is published where the publisher should have known that its publication would offend the sensibilities of a normal person, and whether there has been such an offensive invasion of privacy is to some extent a question of law." This is the rule in this state. Cason v. Baskin, supra, 20 So.2d 243.
Recovery was also denied in Gill v. Hearst Pub. Co., 1953, 40 Cal.2d 224, 253 P.2d 441, 444, where the plaintiffs, husband and wife, were photographed by defendant's employee in an affectionate pose in their confectionery shop, and the picture was used to illustrate an article in defendant's magazine. The court said that plaintiffs had voluntarily submitted to having their picture taken in a public place and had "waived their right of privacy so far as this particular public pose was assumed."
In Gautier v. Pro-Football, Inc., supra, 107 N.E.2d 485, and Ettore v. Philco Television Broadcasting Corp., supra, D.C., 126 F. Supp. 143, both plaintiffs were in the entertainment field and recovery was denied in both cases. In Gautier [107 N.E.2d 489], plaintiff's animal act was presented between halves of a televised professional football game and was shown to the television audience, allegedly without his consent. The court said: "While [plaintiff was] not a *40 part of the game proper, he did become a part of the spectacle as a whole by appearing between the halves, and voluntarily occupying the very center of attraction for several minutes. Under these circumstances, it can hardly be said that his right of privacy was invaded."
In Ettore [126 F. Supp. 149], a film was made of a fight between plaintiff and Joe Louis in 1936. The film was shown on television many years later. The court denied recovery in an action for invasion of privacy on several grounds: (1) that he had waived his right of privacy insofar as this particular fight was concerned; (2) that he was a public figure; and (3) that "the right of privacy does not prohibit the publication of matter which is of legitimate public or general interest though no longer current."
From this review of the decided cases, it is apparent that no similar situation has been presented to the courts in any other state, and it may be decided on the particular facts here present under applicable principles of law.
Even though the plaintiff's role of "actor" in an event having news value was not of his own volition  having been thrust upon him by the investigating officers by mistake  the fact remains that he was in a public place and present at a scene where news was in the making. He was not "tagged" as a gambler; his name was not mentioned; the most that can be said is that his presence at the scene was under ambiguous and, perhaps, suspicious circumstances. But certainly those of his friends and acquaintances who saw his picture on the screen would know that there was nothing sinister about his presence there. Further, the background of his picture clearly showed him to be at a newsstand and not at some residential apartment, and that he occupied the role that, in fact, was his. If not, a simple explanation by him would make this clear. We see nothing humiliating or embarrassing in such a role  shopping at a newsstand  nor anything that would offend a person of "ordinary sensibilities." Cason v. Baskin, supra, 20 So.2d 243.
It should also be remembered that a television newscaster must, like a newspaper reporter, attempt to get before the public "today's news, today." And, as stated in Ross v. Gore, Fla., 1950, 48 So.2d 412, 415; "The public has an interest in the free dissemination of news. This interest was well stated by that great American, Thomas Jefferson, in the following words: `The only security of all is in a free press. The force of public opinion cannot be resisted, when permitted freely to be expressed. The agitation it produces must be submitted to. It is necessary to keep the waters pure. No government ought to be without censors: and where the press is free no one ever will.' It is true that there are occasions when the freedom of the press is abused, just as some individuals abuse their right to speak and write their sentiments freely. * * *
"In the free dissemination of news, then, and fair comment thereon, hundreds and thousands of news items and articles are published daily and weekly in our newspapers and periodicals. This court judicially knows that it frequently takes a legal tribunal months of diligent searching to determine the facts of a controversial situation. When it is recalled that a reporter is expected to determine such facts in a matter of hours or minutes, it is only reasonable to expect that occasional errors will be made. Yet, since the preservation of our American democracy depends upon the public's receiving information speedily  particularly upon getting news of pending matters while there still is time for public opinion to form and be felt  it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer."
We think that, in all the circumstances here, the showing of plaintiff's picture on the telecast in the manner in which it appeared was not an unreasonable or unwarranted invasion of his privacy, as a matter of law; and so the judgment appealed from should be and it is hereby
Affirmed.
DREW, C.J., TERRELL, J., and ALLEN, Associate Justice, concur.